# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 12, 2002 Session

## STATE OF TENNESSEE v. JUDY JOHNSON and STANLEY JOHNSON

**Direct Appeal from the Circuit Court for Gibson County**
**No. 6803    George R. Ellis, Chancellor, Sitting by Interchange**

---

### No. W2001-01272-CCA-R3-CD - Filed June 26, 2002

---

The husband and wife defendants, Stanley and Judy Johnson, were convicted of eleven counts of cruelty to animals, as the result of conditions at a kennel in Gibson County where they were keeping approximately 350 dogs. Stanley Johnson was sentenced to eleven months and twenty-nine days on each count, with all sentences to be served concurrently, and, as to these sentences, to serve ninety days in the county jail with the remainder on probation. Judy Johnson was sentenced, likewise, to eleven months and twenty-nine days on each count, with all sentences to be served concurrently, but she was to serve six months before being put on probation. Both defendants were fined $1000 in each of the eleven counts. On appeal, they argue that the trial court erred in allowing testimony as to a prior similar complaint against Stanley Johnson and in denying total probation for both. Additionally, they argue that the proof is insufficient to sustain the verdicts. We affirm the judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. GARY R. WADE, P.J., filed a concurring opinion.

Scott G. Kirk, Jackson, Tennessee, for the appellants, Judy Johnson and Stanley Johnson.

Paul G. Summers, Attorney General & Reporter; Braden H. Boucek, Assistant Attorney General; Garry G. Brown, District Attorney General; Larry Hardister, Assistant District Attorney General; and Hal Dorsey, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In their appeal, the defendants present the following issues:

    I.   The trial court erred in permitting the State to cross-examine Stanley Johnson regarding a 1993 arrest for cruelty to animals.

II. The trial court made the following sentencing errors:

    A. Utilizing inapplicable enhancement factors and ignoring applicable mitigating factors;

    B. Accepting letters from private citizens regarding sentencing;

    C. Allowing testimony from a representative of the Dyersburg Humane Society regarding restitution;

    D. Accepting a "victim impact" statement from the Dyersburg Humane Society; and

    E. Not granting each defendant complete probation.

III. The evidence was insufficient as to each count of the indictment to support a conviction.

We affirm the judgments of conviction and sentences.

## BACKGROUND

One of the issues presented on appeal is that the evidence is insufficient to support the convictions. In view of the fact that both defendants were convicted of all eleven counts of the indictment, we will detail the proof in ascertaining the sufficiency of the evidence. To do so, we first will review generally the witnesses testifying in the matter and then consider their testimony which was specific as to the three locations where the dogs were kept, as well as to each count of the indictment.

## STATE'S PROOF

The State's first witness was Don Curry, an investigator for the Gibson County Sheriff's Department. He testified that he had executed a search warrant at the defendants' residence in Humboldt on September 16, 1999, and then read his affidavit to the jury:[1]

> On September 12th, 1999, I bought a puppy from Mrs. Judy Johnson and in doing so I found the puppy to be very sick and it appeared to have something wrong with its eyes. I took the puppy to a veterinarian and the veterinarian said that the puppy was almost blind and might even be – was almost blind and might even be blind. I

---

[1]The affidavit, as read, varies slightly from the typed version. However, the differences were not material.

then called Mrs. Johnson. I told her of the situation and she told me she would not refund any money but would replace the puppy with another puppy, so we agreed. On Monday, September 13th, 1999, I took the puppy to Mr. Stanley Johnson and Mrs. Judy Johnson's house and she asked me – she asked me in but would not let me go past the first room. She then brought two puppies out to this room and I noticed the brown dog was getting sick and had no hair on his ears and places on his body. So, I picked the black puppy and took this puppy home. When I got this dog home I noticed this puppy was getting sick also. The next day, which was September 14th, 1999, the puppy seemed very sick and was still throwing up. So, I took the puppy to the veterinarian and that is where the puppy is now. The Sheriff's Department has had several other complaints of this same nature in the recent past.

He then continued with his testimony, narrating the showing of a videotape, which had been recorded during the execution of the search warrant. We will set out the details of his testimony as we review the proof for each count of the indictment.

The State's next witness was Dr. Tim Agee, a veterinarian who operated an animal hospital in Milan. He testified as to his visit to the defendants' kennel the day of the execution of the search warrant, estimating there were approximately 350 dogs on the premises. The dogs were kept in three structures: a large kennel, a mobile home located on the property, and inside the defendants' house, where three dogs were found. The remainder of his testimony will be detailed as to each location where dogs were kept.

**Dwelling House (Counts 1 - 3)**

**A. Count 1 - Black Pomeranian Within the Dwelling House**

**B. Count 2 - White Dog Within the Dwelling House**

**C. Count 3 - Black Scottish Terrier Within the Dwelling House**

Much of the State's proof as to these counts applied to all three, rather than being directed to a single count.

Don Curry was asked about the general conditions within the defendants' house:

Q. What about the general condition of the house? I'm not talking about as to messiness, but I'm talking about the atmosphere in the house or the odor?

A. The house?  The house was hot.  There wasn't no air on.  It was probably in the high 90s in the house and the house had a very strong odor of it but not like the trailer did.

Dr. Agee agreed that the conditions in the dwelling house were "[n]ot very good:"

[I]t was not clean, not very sanitary.  There was feces in the bathtub where puppies had been kept in the bathtub.  I found a whole toenail with a first bone laying in the hallway floor.  There were three puppies that were caged in the living room in a single cage.  It had a lot of feces and urine.  Very much an ammonia smell in there as well.

Dr. Agee said that some of the dogs kept in the house did not have access to water, their bowl being turned over.  He responded, when asked on cross-examination if more than 50% of the dogs were in "good condition:"

I couldn't say that.  Almost every single cage that I walked up to I could physically look at the dog and  tell that there was something that needed to be done.  I'm talking about eye infections, skin problems – whelping dogs.  You know, the Miniature Pinscher that was whelping puppies had a severe skin problem.

Dr. Agee agreed that some dogs, when whelping, do experience hair loss, but said:  "Some breeds do due to hormonal changes. That particular dog, though, had definite secondary staph infections because there were – there were pustules all over the sides of that dog and that's not normal."

## Mobile Home (Counts 4 - 6)

Dr. Agee gave the conditions of the dogs in the mobile home a grade of "F minus."  Asked about the "general conditions inside the mobile home," Dr. Agee responded:

Worse than the kennel.  When we opened the door and went inside the mobile home the ammonia smell was so bad that we didn't even go in.  We just immediately stepped back out because of that.  Your eyes and nose and everything were burning.  Once we did go inside it was – it was pretty bad.  The – there were dogs that were – there was one dog that was a Miniature Pinscher that was in the process of delivering puppies.  There was a dead puppy in the cage.  She had another puppy that had just been born.  The grates that the dogs were whelping on, the puppies could not stand up.  Their legs were sticking through the grates and dangling down in two or three inches thick of feces and urine.  There were puppies in cages – I

-4-

remember one puppy was curled up sleeping in its food bowl because there was nothing in there.

The – there was a Yorkshire Terrier and a Dachshund that both looked to me to have very visible signs of mange. They basically had no hair over at least two-thirds of their body. Eye infections, very noticeable skin infections.

### D. Count 4 - Yorkshire Terrier Within the Mobile Home

According to Curry's testimony during the showing of the videotape: "That dog right there is the Yorkshire Terrier that's in count 4. If you look at if from the shoulders back it has no hair and it has all kinds of sores on it – on its face."

### E. Count 5 - Two Adult Female Dogs with Puppies Within the Mobile Home

Curry described the conditions in which these dogs were kept:

This dog right here is one of 'em in Count 5. What she's got there is one puppy. She's trying to – I don't know if she's trying to protect it or what. I don't want to make a decision on that, but she was – you can see how she was acting, though, and in the cage with her – after we get back up on it – you'll see there was [sic] two dead puppies in the cage with her.

### F. Count 6 – 90 to 100 Female Dogs Within the Mobile Home

As to the 90 to 100 female dogs which were the subject of this count, Curry said:

It's because if you see the shape of 'em and it was so hot in there – half of 'em in there did not have water. They all had food. They're laying in all them feces and the dead dogs. The smell was just unbelievable.

As he provided narrative during the showing of the videotape, Investigator Curry described the condition of dogs which were caged in the mobile home:

That trailer right there was well over 100 degrees in there. It was so hot and it stunk so bad it just – it took your breath.

That there is just showing how high the feces was piled up under the cage that they was in.

-5-

. . . .

This dog here is – that little puppy's laying in front of it. You can see that it will move. It's barely alive. It just kicks every now – and the dog did die later that night and in the cage, if you'll look, there'll be two other dogs in there dead with it. She had two puppies that was dead and that one there is just more or less kicking. It was on its back and couldn't move.

. . . .

That there is a little puppy's feeding stuff hanging through the cage in that feces and stuff is why we shot that. See them puppies right there? Their feet and everything just go through there. That one right there is the second dog that we was talking about. The one on the right there is a dead puppy. The one in the middle is still alive, but then that one laying on the water bowl is dead. The one she's got her head over now, that's a dead puppy and that's a dead one right there, and that one that's in the middle there is alive still, but that one in the water bowl is dead and the one on the far side was dead.

When asked to compare the smell within the trailer to one with which the jury might be familiar, Curry said:

A. Ammonia – I guess if you took like a bottle of ammonia and stuck it right up to your nose and smelled it, that's probably what it – it did – I mean, it just took your breath.

Q. Did it have any physical effect on you – the atmosphere out there?

A. Yes, sir. That's what we was [sic] talking about. It was so hot and just like when you walked in there you could actually feel your skin burn. You could fee[l] your skin burn and just your breathing – I don't know how they went in there to feed the dogs.

**Kennel (Counts 7 - 11)**

As to conditions within the kennel, Dr. Agee said that they were "absolutely not" acceptable for whelping. He first described the general conditions at the kennel:

Well, it was – it varied from pen to pen, but overall it was pretty bad. Most of them – sanitation was not good. We did have some dogs that

-6-

did not have water, some that did not have food. Some areas where the food had just been poured out on the ground and with all the feces on the ground it was not very clean.

On a grading scale, he testified that, although the conditions of the dogs varied, he would grade the overall condition of the kennel as a "D minus." Feces in "atrocious amounts" was present in the stalls. He spoke of the effect that this had on the dogs:

> Well, there's a lot of things it – that it could cause – poor sanitation, skin problems, feet problems as well as respiratory and digestive problems, transference of hookworms and whipworms from one dog to the other and when that stays there for a long period of time they continue to pick them up and it makes for increased infestations.

### G. Count 7 - All Dachshunds Within the Kennel

During his narration of the videotape, Curry testified that the cage with the Dachshunds, the subjects of Count 7, as well as other cages in the kennel, contained "piles and piles" of feces on the concrete. One of the Dachshunds had hair missing from it.

### H. Count 8 - All Scottish Terriers Within the Kennel

As to the Scottish Terriers, the subjects of Count 8, which were shown on the videotape, Don Curry testified:

> There was [sic] five of 'em in there and that pool of blood that you see over there is urine and blood mixed together – they was [sic] infected so bad.

> All that stuff on the floor is feces.

> You can see their water was green. They had food and water, but the water was green and when these dogs used the bathroom there was actually blood in their urine.

### I. Count 9 - All Pomeranians Within the Kennel

Curry described the cage which contained approximately ten Pomeranians, the subjects of Count 9:

> It was about a 4 by 12 foot – maybe 4 by 12 foot long or 10 foot long.

All of that on the floor is nothing but feces.

You can see the dog right here that we're going to zoom in on right there. He's matted up so bad and – he could barely walk. He was sick. He was in pitiful shape. That's his fur that you're looking at.

Dr. Agee said that "there was a lot more [dogs] than should've been in one area that size." He related what he recalled about these dogs, saying "the feces in those runs was an extra large amount, more than some of the others, and I noticed that several of those dogs had eye infections."

### J. Count 10 - All Poodles Within the Kennel

Dr. Agee described the condition of the poodles, the subject of Count 10, kept in the kennel:

I guess they probably stick in my mind more than the rest of them because their general appearance without even being able to do a physical exam on one, their general appearance was not – not good doesn't really describe it. It was really bad. They had not been kept at all. One dog was limping. There were very noticeable eye infections on most of the dogs. Large mats – what I would consider dreadlocks – just hanging off of some of these dogs all the way to the ground which was affecting mobility and also attributing to skin problems.

### K. Count 11 - All Lhasa Apsos Within the Kennel

Dr. Agee said that the Lhasa Apsos, the subjects of Count 11, also had "very large mats. Their whole sides – some of them their whole sides were completely covered." The mats, he said, contributed to skin infections, and were "a great nesting area for external parasites like fleas."

Investigator Curry described another dog, whose breed he could not identify, in the kennel:

This here's on the far side of the kennel. If you look, that dog right there's missing hair off its head. It's got some off its stomach.

This here's – I don't know what kind of dog you call that, but this here's where you can see him when he's walking through all that and you'll see it's maggots in his cage that they've been using going over every – going to the bathroom and – just in and out of it.

There was just millions of maggots right there.[2]

Dr. Agee said that, as constructed, the runs for the kennel were "not bad," but that there were too many in one area. He said "that there's no way those runs had been cleaned in several days." He agreed that if the runs "were being cleaned and food and water provided on a regular basis," his only objection would be to the number of dogs in some of the kennels.

On rebuttal, Dr. Agee identified a photograph of a pen which housed two or three Shar-peis, saying that, based upon their size, he estimated the age of the maggots in the feces was "probably three to four days." He then said, on surrebuttal, that it "was very obvious" the pen was not being cleaned on a daily basis.

The State's final witness was Derrick Avery, the supervisor of the Dyersburg Humane Society. He said that, as he visited the defendants' premises, he had seen a "carcass in the hallway and it was decayed." During the five to seven days he spent on the premises, in removing the dogs, he spent at least eight hours a day the first three days. He considered it to be an emergency situation. He said that approximately thirty-six of the dogs stayed at the Dyersburg Humane Society, where general health care was provided for them. Approximately eighteen to twenty had hookworms and whipworms, which are intestinal worms that come from unsanitary conditions.

### DEFENSE PROOF

Stanley Johnson, testifying in his own behalf, was the first witness for the defense. He said that he and his wife had been raising and selling puppies for about ten years, under the name "D J's Country Kennel." He described the arrangement:

> In the back of the house I had a large kennel with a number of runs
> and it was all closed in and roofed over. It was in the dry. None of
> the dogs were on dirt. This all had concrete runs and chain link
> fences between and dog houses at the end.

He said that the mobile home was used for female dogs having puppies: "[W]e had three tier cages with catch pans under each cage so the fetus [sic] would fall through to the catch pan and not into the next cage. They were set up with water and food. They were watered and fed on a daily basis."

He said that about two and a half years previously, his wife had cornea transplants in both eyes, and her health began to deteriorate. A week before the search warrant was executed, she had breast surgery and was incapacitated for a short period. He said that her doctor had suggested that

---

[2]Although the videotape does not show "millions" of maggots, there were a very large number in what appeared to be an approximately four-foot-in-diameter pool containing blood and, perhaps, other substances.

-9-

she "be away from the stress of the kennel for a while," and they had taken their camper to Chickasaw State Park, which was about ten minutes away from his place of employment. He would spend the night there and "go home and take care of the feeding and watering and come back and go to work." He said that he went to their home in Humboldt and checked the kennel on a daily basis:

> Well, I would check on everything. Of course, pick up the mail and check all the runs, put out feed, fill up all the water buckets, check the trailer and they had to be watered daily and fed daily because they weren't on the large feeders. In the kennel section where we had the 4 by 12 foot runs they all had 25 pound feeders. So, they only had to be checked, you know, a couple of times a week and filled up as needed. But the trailer itself had to be checked and watered and fed everyday.

He said that, at the time the search warrants were executed, he did not have an assistant. Persons that were hired would "come out and work for a day and never come back and it was – we found it very difficult to find any help." He said that the temperature in the trailer, where the puppies were, had to be kept at a higher temperature because the puppies could not "maintain their own temperature." They had used a window air conditioning unit to cool the trailer, but it "had just recently quit operating." He said that they had "a number of fans" operating to circulate the air. He did not believe that the interior was hot to the dogs because the videotape showed that "they was in there jumping around and moving around and they weren't panting and dying of thirst or anything like that." He said that he had last been at the property the day before the search warrant was executed. He found the first search warrant the following day when he had gone to feed and water the dogs. The day after that, he returned and found another search warrant and that more of the dogs had been taken. He said that he would have turned himself in if he had known there was a warrant for his arrest. Looking at several of the photographs which had been admitted during the State's presentation of evidence, he said that there appeared to be nothing wrong with the dogs shown. He said that it was common for female dogs having puppies to lose their hair as they were getting new coats.

He testified that his wife had been left about 100 dogs by another breeder who had died and whose husband had no means of keeping the dogs. He said that, although the indictment referred to a Lhasa Apso, they had none of that breed, but did have a Shih-tzu which was a similar, but smaller, dog. On the day before the search warrant was executed, he "did what [he] could" to clean the kennel. He said that "[t]here just wasn't enough time with me working 80 hours as [sic] week to have time to clean it thoroughly." Although he had not looked specifically for maggots, he said that he had not seen any that day. It only took a day for them to hatch in hot weather, he said. Likewise, he said that he had not seen a dead dog at the kennel the day before the search warrant was executed. He said that they were in the process of "downsizing trying to get out of the dog business." They had gone from 89 to 59 runs at their kennel.

He agreed that some of their dogs had matted hair but stated that his "wife's health did not allow her to maintain the hair on the dogs as well as she used to."

When asked on cross-examination whether the conditions at the kennel were acceptable, he said:

> Well, what I'm saying is that my wife's health condition and the number of hours that I was having to work we was doing the best we could at that short period of time. In the past the runs were kept clean and the dogs were kept groomed, but my wife's health deteriorated and I had to work. She had to have insurance for, you know, her operation. Yeah, I would've like to have kept everything – all the dogs groomed and the runs washed down spotless, but it just wasn't possible at that short period of time.

He described when their problems had begun as they tried to keep up the kennel:

> Well, it wasn't – gradually things just sort of began to get a little worse. It, you know – we were trying to get out of the dogs because we knew her health wasn't going to allow her to be able to take care of 'em. We'd downsized. I had cut back on the number of runs. We had been able to reduce quite a few of the dogs we had, but, you know, if you've got 300 dogs it's kind of hard to get rid of that quantity in a hurry. And, so, it was taking a little time but it was going down.

He said that his wife had been instructed by her physician not to do any lifting the week following her surgery, "[s]o, there was a week there that we could not take as good a care of the dogs as we would've liked." He said that his salary from Premier Manufacturing, where he was employed, was "forty-something thousand" a year. He did not know how much they made each year from their operation of the kennel. He said that it took "five, 10 minutes" to clean a twelve-foot run with a water hose, and that he had cleaned all of the kennels in "one or two hours," but sometimes in as little as 45 minutes. It was difficult to properly clean the kennels "[f]or that short period of time when [his] wife had her surgery."

Asked on cross-examination why they had not hired someone to assist with the kennel, he said that his wife "wasn't really making anything on the dogs." He said that when he began having trouble keeping up with the kennel that he had not hired an assistant because he "could not afford the extra labor." Asked why they had been willing to take the additional 100 dogs, he responded "[h]ow do you tell a man that – whose wife has just died that, no, you're not going to take the dogs and she was a friend of the family?" When asked if he was saying that water in the cages had "turn[ed] green within less than 24 hours," that "[p]retty much so" this is what had occurred.

The next defense witness was James Davenport, who was the son-in-law of the defendants. He said that he had gotten two dogs from the defendants' kennel, and both were in good condition. The defendants' kennel was "in good condition for the amount of dogs that they have." Davenport testified that he had helped the defendants with their dogs in the past, and the dogs were in "very good condition" when he was there. He estimated that he had helped the defendants clean the kennel "[m]aybe two or three times" during the two months preceding the execution of the search warrant.

Ann Dover, the final witness for the defense, testified that she had known the defendants for thirteen to fourteen years, including the entire time the defendants had been in the kennel business, and had become friends with Judy Johnson. Ms. Dover said that she owned two dogs, a Pomeranian and a Boston Terrier, that the defendants raised in their kennel. She stated that these dogs, as well as other dogs she had kept for the defendants in the past, were in "perfect condition." Ms. Dover had visited the kennel on many occasions and did not think there was anything wrong about the number of dogs confined at the kennel. She said that "[a]s long as [the dogs] were being took [sic] care of[,] it was none of my business more or less." She did not see any dogs with matted hair or maggots. However, Ms. Dover admitted that she had not been to the kennel for approximately one year before the day the officers shut it down and was unaware of the kennel's condition at that time.

## ANALYSIS

### I. Testimony Regarding Stanley Johnson's 1993 Arrest for Cruelty to Animals

Stanley Johnson has presented as an issue on appeal that the trial court erred in permitting the State to cross-examine him "regarding a 1993 arrest for cruelty to animals, in violation of Rule 608(b), Tenn. R. Evid." As to this matter, he argues first that because the State failed to give notice of the arrest, utilizing it was improper because the "door" had not been opened during direct examination. Additionally, he argues that the trial court erred in not conducting a hearing to determine if its probative value outweighed the prejudice it created.

Previously, we have set out portions of Stanley Johnson's testimony. The thrust of the defense was that the kennel problems were of recent origin and resulted from Judy Johnson's illness and Stanley Johnson's employment requirements. We now will review the series of questions and answers which preceded the assailed question by the State. The cross-examination of the defendant began in the following fashion:

> Q. Mr. Johnson, you did stand over here and look at the video as it was being played, didn't you?
>
> A. Yes. I did.
>
> Q. It's no question about it that that was a video of the premises that you and your wife own at 94 Pleasant Hill Road here in Humboldt. Is that right?

A. That's right.

Q. Or you did own at the time.

A. That's right.

Q. And it's no question about it that that video depicted the circumstances as the officers found them on that day when they went out and made it. Is that right?

A. That's right.

Q. Are you telling this Court that you subjectively find those conditions depicted on that video acceptable to you as a dog breeder?

A. Well, what I'm saying is that my wife's health condition and the number of hours that I was having to work we was doing the best we could at that short period of time. In the past the runs were kept clean and the dogs were kept groomed, but my wife's health deteriorated and I had to work. She had to have insurance for, you know, her operation. Yeah, I would've like to have kept everything – all the dogs groomed and the runs washed down spotless, but it just wasn't possible at that short period of time.

Q. Well, how long had things been falling to pieces out there, Mr. Johnson?

A. Well, I don't know that I agree with falling to pieces.

Later in the cross-examination, the following colloquy occurred:

Q. Are you saying you and your wife operated this kennel for the previous 10 years and never had any problems?

A. Oh, I wouldn't say that we've never had any problems, but for the most part we didn't have any problems.

Q. Well, I'm asking you are you saying you operated it properly for the last 10 years? Is that what you were trying to tell me? That everything was just fine and the dogs were treated correctly for the last 10 years?

MR. KIRK:  Your Honor, I think he answered that question.  He said for the most part that everything had been fine.

THE COURT:  And your objection is?

MR. KIRK:  That he's asked and answered that.  He's already asked that question and Mr. Johnson answered it.  Now he's asking it again and that's not proper.

GENERAL HARDISTER:  Well, I thought it was being a little more specific. [] I wanted to ask him if he was saying that the dogs had been treated completely properly for the past 10 years.

THE COURT:  Go ahead.

Q.  Sir?

A.  In my opinion they have been.

Q.  Wasn't there a period when – was she ever under a – any sort of supervision or any contact with authorities about the way the dogs were treated?

MR. KIRK:  Your Honor, I'm going to object to that and request a sidebar at this point in time.

THE COURT:  All right.

Following the sidebar conference, the trial court ruled as follows:

THE COURT:  I'm not following you.  His testimony is the majority of the time there has not been any problems –

MR. KIRK:  Right.

THE COURT:  – and I think they're entitled to go into that question.

MR. KIRK:  You're ruling that they're entitled to ask him about the fact that they were charged with misdemeanors, the same offense as this.

-14-

THE COURT: If he says on the stand that they have had no other problems, I think he's entitled to ask the question.

MR. KIRK: He said the majority of the time. He didn't say that they'd never had any other problems. He just said the majority of the time. That's one charge seven years ago. They've been in business 10 years.

GENERAL HARDISTER: If he wants to hedge about talking about what sort of problems he has, and he's obviously hedging about it, then I think I'm entitled to ask –

THE COURT: I think you are, too. I'm going to allow it.

Trial court rulings on the propriety and form of cross-examination are subject to an abuse of discretion analysis, see, e.g., State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994), cert. denied, 516 U.S. 846, 116 S. Ct. 137, 133 L. Ed. 2d 84 (1995); State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S. Ct. 1368, 122 L. Ed. 2d 746 (1993), and such rulings will not be reversed on appeal absent an abuse of that discretion, see State v. Caughron, 855 S.W.2d 526, 541 (Tenn.), cert. denied, 510 U.S. 979, 114 S. Ct. 475, 126 L. Ed. 2d 426 (1993).

Initially, we note that, through Investigator Curry's reading of the search warrant affidavit, jurors learned of prior complaints against the defendants. Relating that the second puppy he had gotten from the defendants "seemed very sick and was still throwing up," Curry then read: "So I took the puppy to the veterinarian and that is where the puppy is now. The Sheriff's Department has had several other complaints on this same nature in the recent past." Accordingly, without objection, the jurors had earlier learned of complaints regarding the defendants' selling other puppies which soon became sick.

The defendants argue that neither the State nor the trial court complied with the requirements of Tennessee Rule of Evidence 608 and that, accordingly, it was error to allow cross-examination as to the defendants' prior problems with the kennel. This rule provides, in pertinent part:

> (b) Specific Instances of Conduct. Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied

-15-

before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;

(2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under this paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court upon request must determine that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

The defendants argue that the trial court erred in not having a jury-out hearing to weigh the probative versus prejudicial effect of this evidence. Additionally, they argue that the State is not allowed to "open the door" during its cross-examination of the defendant, in an effort to make admissible that which, otherwise, would not be admitted. The defendants argue that to do so would be in violation of the comments to Rule 608, which provide, in pertinent part, as follows:

If the witness makes a sweeping claim of good conduct on direct examination, that claim may open the door to cross-examination without pretrial notice and with a lower standard of probativeness, as rebuttal of the broad claim would itself tend to show untruthfulness. Also, there may be instances where the prosecution would not discover the accused's bad acts until after the trial begins, making pretrial notice impossible; in such cases immediate notice and a hearing on the issue before the accused testifies should satisfy the spirit of the rule.

-16-

We agree that the State cannot, by carefully crafted but improper questions on cross-examination, make admissible evidence which, otherwise, would be irrelevant. Thus, in State v. West, 844 S.W.2d 144, 149 (Tenn. 1992), our supreme court concluded that the State could not set up rebuttal testimony by asking improper questions of the defendant during its cross-examination:

> In this case, West never made an issue of his good character. Not until the state asked him on cross-examination whether he was peaceful did he indicate that he was "as peaceful as anybody else." West had never described himself as a non-threatening person before the state asked him if he had threatened Copas. The trial court clearly erred by allowing the state to attempt to show West's propensity for violence by questioning him about his "peaceful" nature and about his prior threat.

Id.

However, the situation in the instant case is quite different from that in West. This case was defended on the premise that the kennel conditions were of recent origin and caused by factors not controlled by the defendants. In response to the State's question on cross-examination to the defendant Stanley Johnson as to whether he "subjectively [found] those conditions depicted on that video[tape] acceptable [ ] as a dog breeder," he dodged the question, saying that they were "doing the best" they could, and that "[i]n the past the runs were kept clean and the dogs were kept groomed." Thus, he had claimed that the conditions began with, and resulted from, his wife's medical problems. The State's question on cross-examination as to whether he was "saying that the dogs had been treated completely properly for the past 10 years" was reasonably related to the defense presented as well as Stanley Johnson's nonresponsive claim, deflecting a question requiring only an affirmative or negative response. While we recognize that an attorney, on cross-examination, cannot manipulate questions so as to make the inadmissible become admissible, we cannot conclude, as the defense urges, that a witness making a volunteered claim, simply because it occurs during cross-examination, is procedurally insulated from "opening the door" to related questions.

The obligation of a witness to testify truthfully on cross-examination was explained in United States v. Havens, 446 U.S. 620, 627, 100 S. Ct. 1912, 1916, 64 L. Ed. 2d 559, 566 (1980):

> In terms of impeaching a defendant's seemingly false statements with his prior inconsistent utterances or with other reliable evidence available to the government, we see no difference of constitutional magnitude between the defendant's statements on direct examination and his answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination. Without this opportunity, the normal function of cross-examination would be severely impeded.

-17-

Given the defense that the kennel problems were recent, it would appear to be highly probative that some years earlier, Stanley Johnson had been alleged to have committed cruelty to animals at the kennel. Further, since the State was not then permitted to present extrinsic evidence, if any they had, to impeach his explanation of the earlier charge, that its resolution required only remedial work, and he had "enclosed the kennel, put a roof over all of it, new doghouses, concrete on all the runs," we cannot conclude that the revelation of this charge affected the outcome of the trial.

As to the claim that the trial court erred in not having a jury-out hearing, we note that the defendants, themselves, requested a bench conference to make their argument as to inadmissibility, and counsel then took up the matter out of the hearing of the jury. No claim is made as to how the defendants would have benefitted from a jury-out hearing, as opposed to a bench conference. The defendants, having requested and gotten a bench conference, cannot now profit from the fact that the trial court did not overrule the request and, *sua sponte*, order a jury-out hearing. See Tenn. R. App. P. 36(a).

We reach a similar conclusion as to the complaint that the State did not provide pretrial notice of this charge, as required by Rule 608. Given the defendant's testimony, it is difficult to envision how these charges would have been defended differently had notice been given. In view of the graphic nature of the testimony and videotape, the fact the jury had learned of other recent complaints against the defendants' kennel, and the overwhelming proof of guilt, we conclude that any error in allowing Stanley Johnson to be asked about the previous charge was harmless. See Tenn. R. Crim. P. 52(a).

## II. Sentencing Issues

The defendants present several sentencing issues which, because of their relationship, we will consider together. The defendants' claims as to sentencing are that the trial court erred in allowing the humane association to prepare a victim impact statement for the presentence report, in allowing into evidence approximately 500 letters supporting the prosecution, and in not granting both defendants total probation. We will consider these issues.

### Victim Impact Statement

The defendants argue that "it was improper for the Court to consider a 'victim impact statement' from the Dyersburg Humane Society" because it was not the victim. The requirement for such a statement is set out in Tennessee Code Annotated section 40-38-205:

> Prior to imposition of sentence in a felony case, the department of correction shall prepare a written victim impact statement as part of the pre-sentence report on the defendant. The statement shall include applicable information obtained during consultation with the victim

-18-

or the victim representative. If the victim or victim representative cannot be located or declines to participate in the preparation of the statement, the department shall include a notation to that effect in the statement. If there are multiple victims and preparation of individual victim impact statements is not feasible, the department may submit one (1) or more representative statements.

Although criticizing the fact that the humane association furnished the so-called victim impact statement, the defendants do not specify any of its contents which were not accurate. For proper sentencing, it is clear that the trial court needed complete and accurate information, including detailed information as to the conditions of the dogs removed from the defendants' premises. If their conditions were less serious than originally thought, this information would be beneficial to the defendants. Since it was the humane association which took custody of the dogs, and became responsible for their care, it is difficult to envision what person or entity would have had more relevant information about the dogs than the humane association or its representative. Objections by the defendants to the fact of or amount of restitution sought by the humane association for its expenses in care and treatment of the dogs could have been addressed by the defendants at the sentencing hearing. Additionally, information from the humane association would appear essential to a complete and accurate presentence report, regardless of the form in which it was provided. Accordingly, we conclude that this assignment is without merit.

### Letters

The defendants object also to the fact that the trial court accepted "into evidence" approximately 500 letters from a number of states, the letters apparently coming from persons with only secondhand knowledge of the facts. Based upon those letters which we reviewed, it appears that information about the case was available on one or more internet websites or publications of humane associations. Other than allowing these letters to be put into the record, over the objection of the defendants, no other references were made to them. We note that the letters come from a number of different states. The great public interest in the prosecution is shown by the volume of the letters, which appear to come from humane associations, kennels, dog fanciers, and other interested persons. Although objecting to the letters, the defendants have presented no authority as to why their reception was improper. We note that letters sent directly to a trial court, received in chambers or open court "should be filed in the cause and made a public record." State v. Birge, 792 S.W.2d 723, 725 (Tenn. Crim. App. 1990). Further, we conclude that these letters were relevant to establish the widespread interest in this matter, which is a consideration in ascertaining the deterrent effect of the sentences. See State v. Hooper, 29 S.W.3d 1, 11 (Tenn. 2000). Accordingly, we conclude that this assignment is without merit.

### Sentencing

Misdemeanor sentencing is governed by Tennessee Code Annotated section 40-35-302. Although otherwise entitled to the same considerations under the Sentencing Reform Act, a

misdemeanant, unlike a felon, is not entitled to the presumption of a minimum sentence. See State v. Seaton, 914 S.W.2d 129, 133 (Tenn. Crim. App. 1995) (citation omitted). The procedure for sentencing misdemeanants was explained by our supreme court in State v. Troutman, 979 S.W.2d 271, 273-74 (Tenn. 1998):

> The sentencing considerations generally used in determining the manner of service for both misdemeanors and felony sentences are codified at Tenn. Code Ann. §§ 40-35-102, -103. See Tenn. Code Ann. § 40-35-102 (noting considerations used in determining whether confinement shall be imposed); Tenn. Code Ann. § 40-35-103 (setting forth considerations to be used when issuing sentencing of confinement). In addition to the statutory considerations for issuing sentences of confinement, the misdemeanor sentencing statute merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement. Compare Tenn. Code Ann. § 40-35-302 ("to consider the purpose of this chapter, the principles of sentencing, and the enhancement and mitigating factors set forth herein") with Tenn. Code Ann. § 40-35-210(f) (stating court shall place on record either orally or in writing what enhancement or mitigating factors it found).

A misdemeanor sentence, as opposed to a felony sentence, contains no sentence range. Since a sentencing hearing is not mandatory, see Tenn. Code Ann. § 40-35-302(a), trial courts are not required to explicitly place their findings on the record. In misdemeanor cases, the trial judge, who is able to observe firsthand the demeanor and responses of the defendant while testifying, must be granted discretion in arriving at the appropriate sentence.

In cases of misdemeanor sentencing, the sentencing court has the authority to place the defendant on probation either after service of part of the sentence in confinement, or immediately after sentencing. See Tenn. Code Ann. § 40-35-302(e)(1)-(2).

The basis for a trial court's determining whether confinement is appropriate is controlled by Tennessee Code Annotated section 40-35-103(1), which provides as follows:

> Sentences involving confinement should be based on the following considerations:
>
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to

provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

At the conclusion of the sentencing hearing in the instant matter, the trial court sentenced the defendants:

The Court finds that Judy Fay Johnson and Stanley Paul Johnson have been found guilty of 11 counts of cruelty to animals. Bonds [sic] are set at $1000 in each of the 11 counts which was done by a jury of good and lawful citizens of Gibson County.

Over 350 puppies and dogs were victims of this gross violation of the law. The victims of this crime were animals that could not speak up to the unbelievable conduct of Judy Fay Johnson and Stanley Paul Johnson that they suffered. Several of the dogs have died and most had physical problems such as intestinal worms, mange, eye problems, dental problems and emotional problems and socialization problems.

Since dogs have entered domestic service of human beings, they have given solace and companionship when needed. They have helped hunt, guard flocks, and in ice and snow have pulled sleds. They have rescued people when lost in snow drifts. They act as police in sniffing out crimes, and they become eyes for those who cannot see. They guard homes and possessions. All this, these creatures do for kind, humane treatment.

Watching this video of the conditions that these dogs were subjected to was one of the most deplorable things this Court has observed in the 22 years in the course of being on the bench.

And though, Judy Fay Johnson, you urge this Court to take into consideration the mitigating factors that you've been sick up to two years prior to them being rescued from your care. You say you've been sick. You talked about reducing the population, but the only thing you did was sell puppies.

The Court finds that you have a previous history of criminal convictions or criminal behavior, that the offense involved more than one victim, that the victims were particularly vulnerable, that you

-21-

have a previous history of unwillingness to comply with conditions of a sentence involving release into the community, and that you abused the position of public or private trust.

The Court further finds that you were charged with this exact same charge in 1993, and after a period of probation, the matter was nollied.

Judy Fay Johnson, you're sentenced to 11 months and 29 days in each of the 11 counts of cruelty to animals. These will be run concurrent. Further, this Court finds that probation would not serve the ends of justice, nor be in the best interest of the public, nor would this have a deterrent effect for such gross behavior.

Therefore, you, Judy Fay Johnson, shall serve six months of your sentence on condition that you make restitution to the Dyersburg Humane Society for $3242.84 for the expenses involved in freeing those dogs from their purgatory and your payment of the fine and costs in full. You are further prohibited from ever running or owning any animal kennel or owning any animal as a pet. Your release classification status shall be 75 percent.

Stanley Johnson, the Court finds that your offenses involve more than one victim. The victims were particularly vulnerable. You treated the victims with exceptional cruelty. You abused the position of public or private trust. You were charged with the exact same charge in 1993 that after a period of probation was nollied.

You are sentenced to 11 months and 29 days in each of the 11 counts. Further, the Court finds that probation would not serve the ends of justice, nor be in the best interest of the public, nor would this have a deterrent effect for such gross behavior to animals. You shall serve 90 days of your sentence on condition that $3242.84 be paid to the Dyersburg Humane Society for the expenses involved in removing the helpless dogs from your custody. You are further prohibited from ever running or owning any animal kennel or owning any animal as a pet.

There are those who would argue that you should be confined in a house trailer with no ventilation or in a cell three by seven with eight or ten other inmates with no plumbing, no exercise and no opportunity to feel the sun or smell fresh air. However, the Courts of this land have held that such treatment is cruel and inhuman, and it is.

You will not be treated in the same way that you treated these helpless animals that you abused to make a dollar.

In their brief, the defendants argue not as to the imposition of the eleven-months-and-twenty-nine-days sentence as to each count, but, instead, that both should have received total probation. They assert that "[t]he Court did not observe or properly follow the sentencing considerations and principles of the Reform Act" in that a period of partial confinement was not the "least severe measure necessary to achieve the purposes for which the sentence is imposed." They interpret that "deterrence" was the only reason expressed by the trial court in ordering confinement.

We respectfully disagree with these arguments. First, it is clear that the trial court observed and followed the principles of the Sentencing Reform Act in imposing punishment and determining that each defendant should serve a portion of the sentence in confinement. The court noted the "unbelievable conduct" of the defendants, detailed the injuries to the dogs in their care, and stated that "the conditions that these dogs were subjected to was one of the most deplorable things this Court has observed in the 22 years in the course of being on the bench." As to each defendant, the court then determined that "probation would not serve the ends of justice, nor be in the best interest of the public, nor would this have a deterrent effect for such gross behavior to animals." Accordingly, we conclude that the trial court found, as to each defendant, that "[c]onfinement [was] necessary to avoid depreciating the seriousness of the offense" and was "particularly suited to provide an effective deterrence to others likely to commit similar offenses." Tenn. Code Ann. § 40-35-103(1)(B). We will next consider the defendants' complaints as to the enhancement and mitigating factors applied by the trial court.

Referring to the notice filed by the State as to enhancement factors for sentencing, the defendants argue that the trial court erred in applying these factors and in not applying applicable mitigating factors.

The defendants argue that the trial court, in sentencing, failed to properly consider as mitigating factors the facts that: their conduct "neither caused nor threatened serious bodily injury," see Tenn. Code Ann. § 40-35-113(1); the conditions at the kennel resulted from the fact of Judy Johnson's surgery one week before the "incident" and Stanley Johnson's working "extensive hours out of town," see Tenn. Code Ann. § 40-35-113(3); "Judy Johnson's physical condition significantly reduced her culpability for the offense," see Tenn. Code Ann. § 40-35-113(8); it was unlikely that their conduct was motivated by a sustained intent to violate the law, see Tenn. Code Ann. § 40-35-113(11); and, at the preliminary hearing, they surrendered the "custody and control" of the dogs, few of the dogs required "medical attention," the dogs "were in relatively good condition and that the only complaint was as to the condition of their confinement," and the defendants "have no intention of returning to the business of raising dogs for sale," see Tenn. Code Ann. § 40-35-113(13).

We respectfully disagree with the defendants' assertion that these mitigating factors were applicable. First, assuming *arguendo* that this factor is even applicable in animal cruelty prosecutions, the claim that the defendants' conduct "neither caused nor threatened serious bodily

injury," ignores the fact that the dogs, many with physical and emotional problems, were caged in deplorable conditions, and that some of the puppies had died. Likewise, the various mitigating factors claiming partial absolution because of Judy Johnson's illness and Stanley Johnson's work requirements ignores their responsibility to provide care, by employees or friends, for the dogs. The kennel was intended to be a money-making operation and their legal responsibility to provide care did not end simply when it became difficult to do so. As for the defendants "surrendering" the dogs at the time of the preliminary hearing, it appears that a number of the dogs had already been removed from the premises by that time. Thus, as for these and the other proffered mitigating circumstances, we conclude that the trial court did not err in declining to apply them.

Additionally, the defendants argue that the trial court erred in accepting as enhancement factors: that the offenses involved more than one victim, the indictments covering all of the dogs, Tenn. Code Ann. § 40-35-114(3); that the victims were "particularly vulnerable because of age or physical or mental disability," Tenn. Code Ann. § 40-35-114(4); and that the defendants "abused a position of public or private trust," Tenn. Code Ann. § 40-35-114(15). Judy Johnson argues that the trial court erred in concluding that she had "a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," Tenn. Code Ann. § 40-35-114(1), and that she "had a previous history of unwillingness to comply with the conditions of a sentence involving release in the community," Tenn. Code Ann. § 40-35-114(8).

As to these factors, we first note that it is somewhat difficult to convert enhancement factors to a cruelty to animals case, many of the factors contemplating a human as the victim of the crime. Since the defendants' argument is not as to the length of the sentences, but that they should have received total probation, we would be limiting the trial court's flexibility in misdemeanor sentencing if we engaged in the same analysis as for sentencing in a felony case. See State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) ("the trial court has more flexibility in misdemeanor sentencing than in felony sentencing"), perm. to appeal denied (Tenn. 2000). The trial court ordered partial confinement as to both defendants because of the gross nature of their acts and the need for deterrence. The letters sent to the prosecutor from throughout the United States demonstrate the wide interest in this matter and establish that, because of the publicity, the punishment would have a deterrent effect. See State v. Hooper, 29 S.W.3d 1, 11 (Tenn. 2000). The geographic spread, including Tennessee, from which these letters came supports the trial court's conclusion as to the deterrent effect of the sentences.

The record demonstrates that the trial court considered the facts of the case and the applicable sentencing principles, as was required. Given the latitude afforded to the court in misdemeanor sentencing, we conclude that the sentences were proper. Likewise, since misdemeanants are not entitled to a presumption regarding alternative sentencing, Tenn. Code Ann. § 40-35-102(6), we cannot conclude that the trial court erred in denying either defendant total probation.

Accordingly, we affirm the sentences of both defendants.

### III. Sufficiency of the Evidence

The defendants argue that the evidence adduced at trial was insufficient as a matter of law to convict them of the eleven counts of the indictment.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). When the credibility of the witnesses was resolved by the jury in favor of the State, the appellate court "may not reconsider the jury's credibility assessments." State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S. Ct. 2600 (2001).

Each count of the indictment charges that the defendants "did unlawfully and knowingly confine an animal in a cruel manner and did unreasonably fail to provide necessary care for an animal in their custody . . . in violation of T.C.A. 39-14-202[.]"

As to the inadequacy of the proof, the defendants argue that "[the] structures in which all of [their] dogs were confined were described as adequate." They describe Dr. Agee's objection to the kennel area was "the number of dogs per kennel and the unsanitary conditions;" as to the mobile

home, "the temperature . . . and the unsanitary conditions;" and as to "the three dogs in the cage in the house, the objection was that feces and urine were present in the cage and the water bowl was turned over." Thus, the defendants argue, "the veterinarian was of the opinion their care was acceptable, if one assumes someone was changing the water daily and feeding them daily and cleaning the cage."

We disagree with the defendants' cast of the evidence. First, the assumption that the dogs were being fed and watered and their cages cleaned on a daily basis is belied by the videotape which shows little food and water available, and virtually none, if any, of it clean, as well as a substantial accumulation of feces throughout the kennel. Although Stanley Johnson testified that he was caring for the dogs on a daily basis, the jury was not bound to accept his testimony as truthful.

Taking the evidence in the light most favorable to the State, which prevailed at the trial on each of the eleven counts of the indictment, the evidence reveals that the defendants maintained, under horrific conditions, in excess of 350 dogs on their premises, housing them in a kennel, a trailer, and inside their residence. The conditions were filthy and unsanitary in each of these locations. Poor, or nonexistent, means of cooling or even circulating the air caused it to be very foul, with an ammonia-like smell. A number of the dogs were not provided food or water and what food was made available was often unsanitary, with water green in color. Many of the dogs and puppies were kept in very crowded and inhumane conditions, apparently without necessary veterinary treatment being provided for worms, mange, eye and skin problems. Feces was allowed to accumulate throughout the facility, with huge numbers of maggots infesting it in one cage. The coats of some of the dogs had very extensive matting problems. Some of the puppies were kept on wire mesh, which allowed large amounts of feces to collect on the unemptied trays beneath their cages, and trapped them, as their legs slipped through, making them immobile. Thus, we conclude that a reasonable trier of fact could have found that the defendants unlawfully and knowingly confined the dogs in a cruel manner and unreasonably failed to provide necessary care, as alleged in the indictment.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

ALAN E. GLENN, JUDGE